IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Theresa Darlene Jones, | ) | C/A No.: 1:12-2894-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

A.      Procedural History

On January 12, 2010, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on June 14, 2008. Tr. at 94–102. Her applications were

denied initially and upon reconsideration. Tr. at 70–71, 73–74. On October 4, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 46–69 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 8, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 18–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 2–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 8, 2012. [Entry #1].

B. Plaintiff's Background and Medical History

1. Background

Plaintiff was 50 years old at the time of the hearing. Tr. at 50. She earned her graduate equivalency diploma ("GED"). Tr. at 50. Her past relevant work ("PRW") was as a food service worker, cashier, front-end manager, and manager of a convenience store. Tr. at 67. She alleges she has been unable to work since June 14, 2008. Tr. at 94.

2. Medical History

In October 2007, prior to her alleged onset date, Plaintiff visited a neurologist complaining of numbness, tingling, and "pins and needles," primarily in her neck and right arm, but also in the rest of her body. Tr. at 287. A nerve conduction study on November 8, 2007, revealed no evidence of radiculopathy, myopathy, or neuropathy. Tr. at 286.

Plaintiff saw Cecilia Cannon, PA-C, on July 31, 2008, complaining of a left ear ache and a pain level of three out of 10. Tr. at 307. Plaintiff reported smoking two packs

of cigarettes per day and was counseled on smoking cessation. Tr. at 307. She was diagnosed with acute sinusitis in a smoker. Tr. at 307. Ms. Cannon indicated that she discussed Plaintiff with Richard B. Bannon, M.D. Tr. at 307.

On September 18, 2008, Plaintiff saw Mark L. Miles, M.D. (in the same practice as Ms. Cannon and Dr. Bannon). Tr. at 308. Plaintiff reported that her ears were "messed up" after being out on a boat and going about ten feet under water. Tr. at 308. She also reported that her fibromyalgia had worsened and was making her chronically depressed and causing her to sooth her pain and depression with alcohol. Tr. at 308. Dr. Miles prescribed Lexapro and encouraged Plaintiff to attend Alcoholics Anonymous if necessary. Tr. at 308. Plaintiff followed up on her fibromyalgia with Dr. Miles in October 2008. Tr. at 308. She reported "doing great" and "[f]eeling much better." Tr. at 308.

On May 15, 2009, Plaintiff saw Ms. Cannon and reported a left earache. Tr. at 303. She reported a pain level of eight out of 10. Tr. at 303. Ms. Cannon noted that Plaintiff was uninsured and that limited her to "what she can and can not do health wise," but indicated that Plaintiff could now afford Lyrica for her fibromyalgia. Tr. at 303.

On August 18, 2009, Plaintiff presented to the emergency room ("ER") and reported that she had fallen while getting out of the pool at home. Tr. at 252. She indicated recent alcohol usage. Tr. at 252. X-rays of her spine demonstrated mild degenerative changes, but no fractures, masses, or lesions. Tr. at 255.

On November 24, 2009, Plaintiff saw Ms. Cannon complaining of severe back pain that started the previous night after she was wrestling with her husband. Tr. at 301.

She was noted to have a history of fibromyalgia, hypothyroidism, hypertension, and anxiety/depression.  Tr. at 301.  She was diagnosed with acute low back pain and prescribed Lortab, Flexeril, Naprosyn, and Klonopin.  Tr. at 301.

On May 3, 2010, Plaintiff was evaluated by agency consultant W. Russell Rowland, MD.  Tr. at 311–15.  She reported that she did not take any naps during the day and that she walked a total of 30 minutes a day with a break every 10 minutes.  Tr. at 312.  She also reported not drinking alcohol for one year.  Tr. at 313.  On examination, she exhibited normal strength and range of motion in her arms and legs.  Tr. at 313.  She exhibited no tenderness anywhere over her entire body and "none of the characteristics of fibromyalgia."  Tr. at 313.  Dr. Rowland found that Plaintiff did not fit the criteria to make a diagnosis of fibromyalgia, but diagnosed her with chronic depression with poor motivation and concentration accompanied by frequent crying spells and panic attacks three to four times per month.  Tr. at 314.

Plaintiff saw Ms. Cannon on May 4, 2010, for lab work related to her medication monitoring.  Tr. at 366.  She reported a pain level of eight out of 10 and further reported using alcohol socially.  Tr. at 366.  Ms. Cannon noted that Plaintiff was not compliant with taking her potassium chloride.  Tr. at 366.  On examination, Plaintiff was in no acute distress and had no swelling of any joints.  Tr. at 366.  Ms. Cannon indicated that Plaintiff's fibromyalgia was not responsive to her current medication and increased Plaintiff's prescription of Tramadol (for fibromyalgia) and Prozac (for depression).  Tr. at 366.

On May 10, 2010, Plaintiff was evaluated by agency consultant Ron O. Thompson, Ph.D. Tr. at 316–19. Plaintiff indicated that she was applying for disability because of chronic pain from fibromyalgia. Tr. at 316. She was unable to spell "world" backward, but was able to count backward from 20 to one and make a semi-difficult cash transaction correctly. Tr. at 316–17. She reported a history of self medication with alcohol and two charges of driving under the influence ("DUI"). Tr. at 317. She reported taking an occasional daily nap, walking 10 minutes at a time several times a day, and attending church regularly on Sundays and occasionally on Wednesdays. Tr. at 317. Dr. Thompson diagnosed Plaintiff with a panic disorder along with moderate major depressive disorder. Tr. at 318. He also diagnosed her with "a pain disorder associated with both psychological factors and general medical condition" and found a "moderate cognitive short circuiting creating concentration and attentional lapses that . . . would make it difficult for her to maintain pace and persistence in a typical work environment." Tr. at 318. Finally, Dr. Thompson concluded these "[p]sychological signs and symptoms would be expected to intensify under even mild physical or other types of stress and distress most likely intensifying physical signs and symptoms as well given chronic pain syndrome." Tr. at 318.

State-agency consultant Craig Horn, Ph.D., completed a Psychiatric Review Technique on May 28, 2010, in which he opined that Plaintiff was mildly restricted in activities of daily living ("ADLs"); moderately restricted in maintaining social functioning, concentration, persistence, and pace; and had no episodes of decompensation. Tr. at 322–35.

On July 26, 2010, Plaintiff visited the ER complaining of feeling weak and of total body ache that began while she was setting up for a garage sale. Tr. at 262. She was noted to be "very tanned" and reported that she had stopped drinking alcohol nine months prior. Tr. at 258, 263. She reported having scraping her lower right leg on some yard equipment. Tr. at 263. She was discharged on July 30, 2010, with a diagnosis of Salmonella, and it was noted that she had improved in all respects except for not having resolution of her diarrhea. Tr. at 257.

State-agency consultant Barbara Cochran, M.D., completed a residual functional capacity ("RFC") assessment on October 26, 2010. Tr. at 357–64. She opined that Plaintiff could perform light work; occasionally climb ladders, ropes, and scaffolds; occasionally crouch and crawl; frequently climb ramps and stairs; frequently balance, stoop, and kneel; and should avoid concentrated exposure to hazards. Tr. at 359, 361.

On November 22, 2010, Ms. Cannon and Dr. Bannon completed a questionnaire as to Plaintiff's RFC.[1] Tr. at 407–09. They diagnosed her with fibromyalgia and depression and further noted her prognosis was guarded. Tr. at 407. They identified the following objective signs: multiple tender points, no restorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome ("IBS"), frequent and severe headaches, vestibular dysfunction, chronic fatigue syndrome, numbness and tingling, anxiety, panic attacks, depression, and hypothyroidism. Tr. at 407. They indicated that the following factors precipitated

---

[1] Although Ms. Cannon routinely indicated in her treatment notes that she had consulted with Dr. Bannon regarding Plaintiff's treatment, it does not appear that Dr. Bannon personally examined Plaintiff prior to completing the RFC questionnaire.

Plaintiff's pain: movement and overuse, fatigue, hormonal changes, static position, stress, and cold. Tr. at 407. They opined that Plaintiff had constant pain and would be unable to hold a job because of stress. Tr. at 407. They further opined that Plaintiff could sit 20 minutes at a time; could stand 15 minutes at a time; could sit, stand, and walk less than two hours in an eight-hour day; would need to be able to walk every 20 minutes for about five minutes; would need a job that permits shifting positions at will; could rarely lift 10 pounds; and could occasionally twist, but rarely stoop/bend, and never crouch or climb. Tr. at 408–09. They estimated that Plaintiff would miss more than four days of work per month. Tr. at 409.

On May 13, 2011, Plaintiff returned to Dr. Cannon for prescription refills and reported chronic pain. Tr. at 406.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on October 4, 2011, Plaintiff testified that she was 50 years old. Tr. at 50. She was 199 pounds and 5'6" to 5'7", but noted that her weight did not cause her any problems, even when she weighed 240 pounds. Tr. at 62. She said she had lived with and cared for her mother (who had congestive heart failure) when she first stopped working, but she stated her sister kicked her out because Plaintiff was not able to watch their mother. Tr. at 60, 62. She stated that she lived with her boyfriend, who was on disability. Tr. at 51–52. She said she dropped out of high school in eleventh grade, but earned her diploma. Tr. at 50. She testified that she last worked as a manager at Little

Cricket, where she stopped working on June 14, 2008, because she could not concentrate and was "messing up." Tr. at 51. She described this as "mashing the wrong keys, money coming up short, couldn't order groceries right [for the store]," and not being able to put the groceries on shelves because they were too heavy. Tr. at 59. She received unemployment compensation following this, but testified that she could not have worked if she had been offered another job. Tr. at 52–53. She reported working from 1979 to 2008. Tr. at 61.

Plaintiff testified that, on an average day, she wakes up and spends half an hour to an hour and a half in the bathroom due to her diarrhea problem, then she gets up and does what little bit she can. Tr. at 53. This includes washing dishes and dusting a little bit in higher places, but not too low. Tr. at 54. She said she cannot clean the bathtub or mop. Tr. at 54. She said she can take care of her personal hygiene. Tr. at 60. She testified that she spends most of an average day sitting, crying, watching a little television, and trying to do a little more work. Tr. at 56. She said she can read, but cannot concentrate on what she is reading. Tr. at 59. She testified to shopping "maybe once a month" for groceries with her boyfriend, who she says cooks and does yard work. Tr. at 58. She stated she has not driven in five years, and stopped driving due to anxiety, panic attacks, and drinking, which resulted in a DUI. Tr. at 56. She testified to being alcohol-free for three years. Tr. at 57.

Plaintiff testified that when she stands up straight, her back, legs, and arms hurt. Tr. at 54. She said she could not even stand for three minutes at a time. Tr. at 56. She said she could only walk about 10 minutes at the most and then would have to sit down

8

because of the pain.  Tr. at 55.  She also said she could not sit in a chair for more than 10 minutes before she had to get up or squirm, and remarked "it's pulling right now right here . . . on my leg and the side."  Tr. at 55.  She said she could lift maybe five pounds because it hurts to do so, and noted she could not lift her dog.  Tr. at 56.  She further stated that she experiences "tingling and needle pain" in her arms and hands, and that she could not peel a potato.  Tr. at 56.  Plaintiff rated the pain she experiences on a regular day as an eight out of 10.  Tr. at 54.  She takes Tramadol for the pain, but said that it does not help.  Tr. at 54.  She takes all of her medicines as directed, but has not told her doctors that Tramadol does not help.  Tr. at 54, 57.  She testified that she could not afford "the right medicine."  Tr. at 55.  She says that due to her medication, she gets dizzy when she stands up and has some difficulty concentrating.  Tr. at 57–58.  She stated that she does not have the money to see a psychiatrist for her depression and that she does not have health insurance.  Tr. at 60.

When asked about evidence that she was at a yard sale in July of 2010, she appeared to indicate that she was not involved in actually operating the yard sale.  Tr. at 63.  When asked about evidence indicating she had been wrestling with her husband, she explained that it must have referred to when she and her boyfriend were exercising and playing in the pool, which included wrestling.  Tr. at 63.  She says she still tries to walk for exercise about three times a week, but only does so for about 10 minutes.  Tr. at 63–64.

b. Vocational Expert Testimony

Vocational Expert ("VE") Vincent Hecker reviewed the record and testified at the hearing. Tr. at 65. The VE categorized Plaintiff's PRW as a food service worker as light, unskilled work; as a cashier as light, unskilled work; as a front-end manager as light, skilled work; and as a manager of a convenience store as light, skilled work. Tr. at 67. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit six hours in an eight-hour workday; only occasionally crouch, crawl, or climb ropes, ladders, and scaffolds; could frequently climb, balance, stoop, and reach overhead; and would need to avoid concentrated exposure to hazards. Tr. at 67. The ALJ also limited the hypothetical individual to simple one–two step tasks in a low stress environment, which he defined as requiring occasional public contact. Tr. at 67. The VE testified that the hypothetical individual could not return to her PRW. Tr. at 68. The ALJ asked whether there were any other jobs in the national economy that the hypothetical person could perform. Tr. at 68. The VE identified the following light, unskilled jobs: price marker, assembler, and packer. Tr. at 68. The ALJ then modified the hypothetical to include daily absences from the work station lasting multiple hours or the entire day and lapses that would make it difficult to maintain pace and persistence in a typical work environment. Tr. at 68. The VE stated that these limitations would preclude work. Tr. at 68.

2. The ALJ's Findings

In his November 8, 2011, decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since June 14, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia; degenerative disc disease, cervical spine; depression; and anxiety/panic disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, I find the claimant is able to lift or carry up to 20 pounds occasionally and 10 pounds frequently. I find that she can sit, stand, or walk for up to six hours each out of an eight-hour workday. She can occasionally crouch, crawl, and climb ropes, ladders, and scaffolds. Additionally, I find that she can frequently climb ramps or stairs, balance, stoop, kneel, and reach overhead. She must avoid concentrated exposure to hazards. Lastly, she is limited to jobs involving simple one-two step tasks in a low stress work environment, defined as having only occasional public contact.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 14, 1961, and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently change age category to closely approaching advanced age. (20 CFR 404.15.63 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, since June 14, 2008, through the date of this decision (20 CFR 404.920(g) and 416.920(g)).

Tr. at 20–30.

### 3. Additional Records Submitted to the Appeals Council

After the ALJ's unfavorable decision in November 2011, Plaintiff saw Dr. Bannon on December 7, 2011. Tr. at 210. Plaintiff reported feeling extremely depressed and anxious, problems related to IBS, and a worsening of her various symptoms following her denial of Social Security benefits. Tr. at 210. Dr. Bannon noted that Plaintiff had severe depression beyond what could be treated by a family medicine practice and also diagnosed her with IBS and fibromyalgia. Tr. at 210. The doctor stated that until Plaintiff could "get ahead of her depression," all of her other problems would be more difficult to treat, and he impressed upon her that she really needed to see a psychiatrist. Tr. at 210.

## II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  The ALJ did not properly evaluate the opinion of Plaintiff's treating physician; and

2)  The ALJ failed to conduct a proper credibility analysis.[2]

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

---

[2] The undersigned notes that Plaintiff included a third allegation that she described as the ALJ's mischaracterization and misstatement of the record [Entry #13 at 9–11]; however, the issues addressed under this allegation of error are more appropriately analyzed in conjunction with the ALJ's credibility determination.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

_____

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

*v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Evaluation of the Treating Medical Providers' Opinion

Relying on outdated Fourth Circuit case law, Plaintiff argues that the ALJ failed to give sufficient weight to the November 2010 joint opinion of Ms. Cannon and Dr. Bannon.   [Entry #13 at 6–9].   The Commissioner argues the ALJ's treatment of the opinion is supported by substantial evidence.   [Entry #14 at 13].

If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.   SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).   The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.   *See* 20 C.F.R. § 404.1527(c)(2).   However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam).   Rather, "[c]ourts evaluate and

weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

On November 22, 2010, Ms. Cannon and Dr. Bannon completed the RFC questionnaire summarized above. Tr. at 407–09. In pertinent part, they opined that Plaintiff could sit 20 minutes at a time; could stand 15 minutes at a time; could sit, stand, and walk less than two hours in an eight-hour day; would need to be able to walk every 20 minutes for about five minutes; would need a job that permits shifting positions at will; could rarely lift 10 pounds; and could occasionally twist, but rarely stoop/bend, and never crouch or climb. Tr. at 408–09. They estimated that Plaintiff would miss more than four days of work per month and would be unable to hold a job because of stress. Tr. at 407, 409.

In according the opinion little weight, the ALJ first noted that while the office notes show that Dr. Bannon treated Plaintiff for four years, a closer review of the records

reveals that she was seen only seven times during that period and was never personally seen by Dr. Bannon. Tr. at 27–28. The ALJ then found that the opinion was not consistent with Ms. Cannon and Dr. Bannon's treatment notes or with the ALJ's observations of Plaintiff at the hearing. Tr. at 28. In so finding, the ALJ made the following observations:

- Although the opinion indicates that Plaintiff has multiple tender points, treatment records do not demonstrate that these treaters ever did an examination for fibromyalgia tender points or trigger points. Tr. at 28.

- Despite the indication that Plaintiff suffers from IBS, the treatment notes contain no mention of IBS and do not document that Plaintiff ever complained of such symptoms. Tr. at 28.

- The limitations set forth in the opinion are inconsistent with Plaintiff's ability to sit for 30 minutes during the hearing and with her ADLs, including caring for her dying mother, participating in a yard sale in the hot sun, sustaining an abrasion after scraping her leg on yard equipment, and wrestling with her husband. Tr. at 28.

- The postural limitations included in the opinion are inconsistent with Plaintiff's documented examinations demonstrating normal range of motion, normal gait and station, and no tenderness anywhere over her entire body. Tr. at 28.

- The opinion that Plaintiff is unable to hold a job because of stress is outside Ms. Cannon's and Dr. Bannon's area of expertise because they are not mental health professionals. Tr. at 28.

Plaintiff fails to point out any flaws in the ALJ's reasoning and generally argues, without citation to the record or to case law, that the ALJ failed to consider the continuous and consistent reports of pain and psychological overlay that necessarily limited her activities. [Entry #13 at 9]. Plaintiff attempts to bolster the opinion of Ms. Cannon and Dr. Bannon by citing to the opinion of Dr. Thompson, who opined that Plaintiff had "moderate cognitive short circuiting creating concentration and attentional lapses that . . . would make it difficult for her to maintain pace and persistence in a typical work environment." [Entry #13 at 8–9 (citing Tr. at 318)]. The ALJ, however, also discounted Dr. Thompson's opinion because it was inconsistent with Plaintiff's self-reported ADLs and because conflicts between Dr. Thompson's report and other medical records suggest that Plaintiff was not completely truthful in her answers to Dr. Thompson. Tr. at 27. The undersigned finds that the ALJ set forth a reasonable explanation for giving Dr. Thompson's opinion little weight; thus, Plaintiff cannot rely on it in support of the opinion of Ms. Cannon and Dr. Bannon.

Because Plaintiff has identified no real error in the ALJ's treatment of the opinion of Ms. Cannon and Dr. Bannon and the ALJ provided numerous reasons for according that opinion little weight, the undersigned recommends a finding that the ALJ's decision to do so is supported by substantial evidence.

### 2. Assessment of Plaintiff's Credibility

Plaintiff also argues that the ALJ failed to adequately assess her credibility because he employed boilerplate language in his decision when finding her testimony less than credible. [Entry #13 at 11–13]. In addition, Plaintiff contends that the ALJ did not

afford sufficient weight to her work history, placed too much weight on her ADLs, and improperly employed a "sit and squirm" test. *Id.* at 9–11, 13.

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged. *See* 20 C.F.R. § 416.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain). The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain." 76 F.3d at 594 (internal quotation omitted). Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595. This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC. Tr. at 24–25.

In evaluating Plaintiff's credibility, the ALJ first noted that there are inconsistencies between Plaintiff's testimony and the record evidence that detract from her credibility. Tr. at 25. The ALJ noted that Plaintiff's testimony regarding being alcohol free for three years was inconsistent with medical records documenting alcohol usage in 2009. Tr. at 25. He also found that Plaintiff's testimony that she could only sit for 10 minutes at a time was inconsistent with her ability to sit for 30 minutes during the hearing. Tr. at 25. The ALJ described Plaintiff's ADLs, including Plaintiff's ability to swim 10 feet under water and wrestling with her husband, and concluded that they were inconsistent with her alleged pain level of eight out of 10. Tr. at 25. Referencing Plaintiff's medical records, the ALJ found that her physical examinations, documenting a normal lumbar spine and non-tender extremities with full range of motion, did not support the alleged severity of her limitations. Tr. at 25.

As an initial matter, the undersigned finds that the ALJ's use of standard language to set forth his conclusion regarding Plaintiff's credibility was not in error. ALJs routinely employ this language and the case law, including that cited by Plaintiff, holds that it is not error to do so unless the ALJ fails to provide an explanation in supporting of the finding. *See McFadden v. Astrue*, C/A No. 9:11-1087, 2012 U.S. Dist. LEXIS 113845, at *2–3 (D.S.C. Aug. 14, 2012). Here, the ALJ provided concrete reasons for his credibility determination and did not, as Plaintiff argues, merely rely on boilerplate language.

With regard to the reasons offered by the ALJ for discounting Plaintiff's credibility, Plaintiff argues that the ALJ improperly relied on her ADLs in finding that

she was not disabled. [Entry #13 at 9]. Plaintiff is correct that evidence of her limited ADLs, on its own, is insufficient to establish her ability to engage in substantial gainful activity. *See Higginbotham v. Califano*, 617 F.2d 1058, 1060 (4th Cir. 1980). However, her argument on this issue suggests that the ALJ's decision was based solely on his consideration of her ADLs. That is not the case. In discounting her credibility, the ALJ considered Plaintiff's ADLs, but also considered inconsistencies between her testimony and the record as well as the lack of objective medical evidence to support the alleged severity of her impairments. Furthermore, pursuant to SSR 96-7p, it is appropriate for an ALJ to consider a claimant's ADLs in assessing her credibility. Consequently, the undersigned does not find that the ALJ placed undue weight on Plaintiff's ADLs.

Plaintiff also argues that, in assessing her credibility, the ALJ should have placed great weight on her long work history. [Entry #13 at 13]. While a plaintiff's work history may be a factor supporting credibility, it is not dispositive. *See* SSR 96-7p (finding that a credibility assessment "must be based on consideration of all the evidence in the case record," which "includes, but is not limited to" a claimant's "prior work record and efforts to work"). Because a claimant's work history is not a controlling factor in assessing credibility and the ALJ offered numerous reasons for discounting Plaintiff's credibility, the undersigned concludes that the ALJ did not err in failing to assign great weight to Plaintiff's work history. To the extent the ALJ erred in failing to discuss Plaintiff's work history in his credibility assessment, the undersigned recommends finding that any such error was harmless.

Finally, Plaintiff contends the ALJ improperly applied a "sit and squirm" test by noting her ability to sit for over 30 minutes at the hearing. [Entry #13 at 10–11]. Pursuant to SSR 96-7p, where a claimant attends a hearing before an ALJ, the ALJ may "consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." The ALJ in this case did not rely solely on his observations of Plaintiff in discounting her credibility. Rather, as is permitted by SSR 96-7p, it was one factor of many. Consequently, the undersigned recommends a finding that the ALJ's consideration of his observations of Plaintiff at the hearing was not in error.

For the foregoing reasons, the undersigned recommends a finding that the ALJ's credibility assessment is supported by substantial evidence and in compliance with the applicable regulations.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

Shiva V. Hodges

September 30, 2013                         Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).